Emil D. RAUBAL, Individually and as Liquidator of Sociedad Minera Aconcagua Ltda., a partnership, and Ilia Petrof, Plaintiffs,

v.

ENGELHARD MINERALS & CHEMICALS CORPORATION et al., Defendants.

No. 71 Civ. 5628.

United States District Court, S. D. New York.

Sept. 25, 1973.

Milbank, Tweed, Hadley & McCloy, New York City, for plaintiffs by Russell E. Brooks, New York City.

Cahill, Gordon & Reindel, New York City, for defendants Engelhard and Derby; David R. Hyde, Leonard A. Spivak, George Wailand, New York City, of counsel.

Rabinowitz, Boudin & Standard, New York City, for defendant Codelco; Victor Rabinowitz, K. Randlett Walster, New York City, of counsel.

## OPINION

BONSAL, District Judge.

This is a motion for summary judgment by the defendants in a private antitrust action brought by plaintiffs under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and Sections 73, 74, 75 and 76 of the Wilson Tariff Act (15 U.S.C. §§ 8–11), which extend the antitrust laws to the importation of goods. Plaintiffs seek treble damages and an injunction under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26).

Jurisdiction is asserted under 28 U.S.C. § 1337. Plaintiffs also allege common law claims under the doctrine of pendent jurisdiction. Defendants' motion for summary judgment is based on the ground that plaintiffs lack standing to sue.

Plaintiff Raubal is a citizen and resident of Austria. Plaintiff Petrof is a citizen of Chile and a resident of Austria. For several years prior to October 1, 1971, plaintiffs, as the partners in Sociedad Minera Aconcagua Ltda. ("Sominac"), a Chilean partnership, were engaged in the business of mining copper in Chile and selling and exporting copper materials.[1] Plaintiffs dissolved Sominac in October, 1971 and appointed Raubal as Liquidator.

Defendant Engelhard Minerals & Chemicals Corporation ("Engelhard"), is a Delaware corporation with its principal place of business in New York City. During the years relevant to this litigation, 1969 to 1971, it was engaged in the exportation of copper from Chile. Defendant Derby & Co., Inc. ("Derby") is a New York corporation wholly owned by Engelhard, with its principal place of business in New York City.[2] Defendant La Corporacion del Cobre ("Codelco") is a body corporate organized under the laws of the Republic of Chile and has its principal place of business in Chile, with an office in New York City. Codelco is engaged in the mining and exportation of Chilean copper.

In 1966, Sominac commenced the operation of a copper mine and beneficiation plant in Chile. On December 18, 1969, Sominac entered into a written agreement with the Philipp Brothers Division ("Phibro") of Engelhard, pursuant to which Phibro undertook to act as Sominac's exclusive agent for a period of three years for the sale and export of

---

1. The term "copper materials" as used here includes copper ore, copper concentrates, copper cement, blister copper, and refined copper.

2. In an affidavit submitted in connection with the present motions, Derby contends that it is not engaged in the "relevant lines of commerce" defined in the plaintiff's amended complaint, that it has never engaged in business with the plaintiffs, and that it has no knowledge of or connection with the subject matter involved in this suit.

all of the copper produced by Sominac. On April 15, 1971, while the prior agreement was still in effect and pursuant thereto, Phibro agreed with Sominac to purchase, *as principal,* all of Sominac's copper production for the months beginning in February, 1971, and continuing to December, 1971. This second agreement called for delivery of copper materials f. o. b. at the port of Caldera, Chile. Phibro agreed to pay 90% of the price of each shipment within forty days following the bill of lading date, and to pay the remaining 10% upon completion of weighing and assaying. Under the 1971 agreement, Phibro made seven shipments from Chile to Liverpool, England between April 24, 1971 and September 1, 1971, and paid the 90% called for by the agreement. Plaintiffs contend that the 10% payments with respect to these shipments have not been made, and that with respect to an eighth shipment from Chile to Liverpool (80 tons) on October 14, 1971, Phibro has made no payment as required by the agreement.

On July 17, 1971, the Republic of Chile nationalized the major copper mines in Chile, which were owned by Anaconda Copper Company and Kennecott Copper Company. On October 1, 1971, plaintiffs dissolved Sominac, as of October 10, 1971, and appointed Mr. Raubal Liquidator by a "notarial act" executed on October 11 in Kitzbuhel, Austria. On October 28, 1971, the Republic of Chile by decree appointed an "interventor," an official of Empresa Nacional de Mineria, to manage the Sominac properties. The Court is informed that the interventor has continued to operate the Sominac properties pending a final disposition of ownership rights.

On July 7, 1972, by "Decree-with-Force-of-Law," the Chilean government designated defendant Codelco as the sole agent of the nationalized copper companies for the sale and exportation of copper. On October 9, 1972, the Republic of Chile decreed a commercial monopoly of the exportation of all Chilean copper, to be administered by Codelco.

Plaintiff Raubal instituted this action on December 27, 1971, with the filing of a complaint against Engelhard and Derby. The complaint alleged that the sum of $158,000 (representing the amounts allegedly due on the eight shipments of copper materials from Chile to Liverpool under the 1971 contract), plus interest, was owed him by the defendants pursuant to the 1969 and 1971 agreements. Engelhard moved to stay the action pending arbitration, on the ground that both the 1969 and 1971 agreements contained arbitration clauses. While the motion for a stay was pending, the plaintiffs filed an amended complaint on March 31, 1972, naming as defendants Engelhard, Derby, and Codelco.

The amended complaint re-alleges the contract claims and, in addition, seeks treble damages in the amount of $6,000,000 for alleged violation of the United States antitrust laws.

In answer to defendants' interrogatory for an itemization of plaintiffs' damages, plaintiff Raubal stated:

"Mine—at least $2 million; plant and equipment—$2 million; monies due for copper delivered—approximately $158,000."

It appears from this that plaintiffs' asserted antitrust damages of $6,000,000 were arrived at by trebling Raubal's estimate of the value of Sominac's mine of $2,000,000.

In 1972, defendants Engelhard and Derby moved to dismiss the amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or for summary judgment. Defendants contended that plaintiffs' antitrust claims were premised upon the acts of the Chilean government and therefore were barred by the "Act of State" doctrine. See American Banana Co. v. United Fruit Co., 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909); Occidental Petroleum Corp. v. Buttes Gas & Oil Co., 331 F.Supp. 92 (C.D.Cal.1971), aff'd, 461 F.2d 1261 (9th Cir. 1972). Plaintiffs argued that the amended complaint did not challenge the public acts of Chile but only the unlawful

commercial activities of the defendants and that the affidavit submitted by the plaintiff Raubal raised factual issues precluding summary judgment. On November 13, 1972, after argument, the Court denied Engelhard and Derby's motions "without prejudice to renewal after discovery is completed."

Thereafter, both sides embarked on discovery. On January 2, 1973, plaintiffs served interrogatories and requests for the production of documents on all defendants. Derby produced no documents and answered no interrogatories, responding that it had never engaged in business with plaintiffs and that it had no knowledge or connection with the subject matter of the suit.

Codelco requested and was granted three 30-day extensions of time to file their answers to plaintiffs' interrogatories. On April 24, 1973 (before the last extension had expired), Codelco filed this motion to dismiss the complaint as to it and for summary judgment.[3] Engelhard joined in Codelco's motion.[4] Plaintiffs oppose these motions.[5]

■■■ With respect to the defendants' motion for summary judgment, the Court must determine whether there exists a genuine issue of fact for trial or whether the defendants are entitled to judgment as a matter of law. The purpose of Rule 56 is " 'not to cut litigants off from their right of trial by jury if they really have issues to try' *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, [64 S.Ct. 724, 88 L.Ed. 967] (1944)." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). And while summary procedures should

be used sparingly in antitrust litigation, see, e. g., Investment Properties International, Ltd. v. IOS, Ltd., 459 F.2d 705 (2d Cir. 1972), as Judge Weinfeld wrote in Schwartz v. Broadcast Music, Inc., 180 F.Supp. 322 (S.D.N.Y.1959),

". . . if plaintiffs are without right to maintain this action, then the defendants are entitled to be protected against the heavy burden of expense and effort entailed in a protracted and intricate trial. Moreover, the proper administration of justice requires, in the interests of other litigants who await and are entitled to a trial, that the Court's energies and time be not deflected by an unnecessary and time-consuming trial." 180 F.Supp. at 325.

■■■ The basic question presented by these motions is whether plaintiffs have standing to sue under the antitrust laws. To have standing, there must be some showing that defendants violated the antitrust laws and that this injured plaintiffs in their business and property. Plaintiffs have been injured in their business and property by the various decrees of the Chilean Government, but this is a separate issue. Plaintiffs may not recover from the defendants for these injuries in the guise of an antitrust action.

Plaintiffs base their antitrust claims on Section 4 of the Clayton Act (15 U. S.C. § 15), which provides:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . and shall recover threefold the damages by him sustained, and the cost of

---

3. In addition, Codelco moved for a protective order pursuant to Rules 6(b) and 26(c) of the Federal Rules of Civil Procedure to extend the time for it to move or answer with respect to the plaintiffs' interrogatories until 60 days following the determination of its motion to dismiss or for summary judgment.

4. With respect to discovery, Engelhard produced documents from its Chilean, New York, and Swiss offices, though it has refused to produce documents relating to attempts by Engelhard to obtain Codelco agen-

cies for countries other than the United States, which Engelhard maintains are irrelevant to this action. Engelhard represents that it has turned over approximately 14,000 pages of documents to the plaintiffs, and that this includes all documents and all interrogatories "conceivably relating" to the question of plaintiffs' standing.

5. Plaintiffs have submitted affidavits in opposition and, in addition, have moved for an order compelling further discovery and for costs and attorneys' fees.

suit, including a reasonable attorney's fee.

Plaintiffs contend in their amended complaint that the defendants and others "have engaged in a combination and conspiracy in unreasonable restraint of United States interstate and foreign trade" with respect to the mining and export of Chilean copper materials to the United States, that the defendants have attempted to monopolize the business of mining and exporting Chilean copper, and that they have conspired to monopolize such business, all in violation of the United States antitrust laws. Plaintiffs further contend in their amended complaint that by reason of the acts alleged to be in violation of the antitrust laws, defendants attempted to attain and did attain a monopoly in the following lines of commerce:

> "those markets encompassing the mining and importation of foreign copper materials into the United States for further processing and/or sale in the United States domestic or export trade and the mining and importation of Chilean copper materials for further processing and/or sale in the United States domestic or export trade."

Defendants argue that plaintiffs have no standing to sue under Section 4 of the Clayton Act because Sominac exported no copper to the United States and thus had no business or property interest in the lines of commerce that the complaint alleges were monopolized by defendants.

■ To have standing to assert a treble damage claim under the antitrust laws, the plaintiff must have been "engaged in the sort of legitimate activities which [the antitrust laws were] intended to protect." Billy Baxter, Inc. v. Coca-Cola Company, 431 F.2d 183, 187 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971). The test for determining standing is whether the plaintiff was "within the 'target area' of the alleged antitrust conspiracy," that is, whether the plaintiff is "a person against whom the con-

spiracy was aimed." Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc., 454 F.2d 1292, 1295 (2d Cir. 1971), cert. denied, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972).

Plaintiffs' amended complaint alleges that the aims of the conspiracy were: "a) to establish Codelco as the sole operator of copper mines in Chile and the sole exporter of copper materials from Chile to the United States and elsewhere; b) to establish Philipp Brothers as the sole agent of Codelco and the sole distributor and seller of Chilean copper materials imported into the United States; c) to eliminate Sominac, the United States companies, and all others as competitiors [sic] in said trade and commerce; [and] d) to control the price of copper materials imported from Chile into the United States and sold therein." However, the evidence developed to date fails to show that the acts of the defendants had an impact on United States commerce so far as these plaintiffs are concerned. Such an impact is essential to plaintiffs' action under the antitrust laws. See Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 705, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); Steele v. Bulova Watch Co., Inc., 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 252 (1952). As Judge Hand wrote in United States v. Aluminum Company of America, 148 F.2d 416, 443 (2d Cir. 1945), "We should not impute to Congress an intent to punish all whom its courts can catch, for conduct which has no consequences within the United States."

To have standing, plaintiffs must show that they were engaged in some way in the importation of Chilean copper materials into the United States. Defendants contend that no copper was ever imported into the United States by Sominac, pursuant to either the agreement of December 18, 1969 or the agreement of April 15, 1971. On the other hand, plaintiff Raubal stated in an affidavit sworn to on July 6, 1972 and submitted in opposition to a prior summary judgment motion: "I know that Phibro

did import such copper materials to the United States, and this fact should be revealed in the records of Phibro. I further believe that pre-trial discovery will also show that subsequent to November 5, 1971, Phibro did export a certain quantity of copper or copper materials from Chile to the United States." Continuing discovery has developed no support for this statement.

The plaintiff's original complaint alleged that each of the eight shipments under the agreement of April 15, 1971 went from Chile to England. Indeed, there is no evidence contrary to those allegations. With respect to shipments under the agreement of December 18, 1969, Engelhard (of which Phibro was a division) maintains that as Sominac's exclusive agent, it never sold nor shipped any Sominac copper materials to the United States. There is likewise no evidence that any copper from Sominac's mine was ever shipped to the United States, except for two assay reports indicating that small samples of the ore being shipped to Liverpool were assayed in the United States. Each of these samples weighed approximately one pound. As samples for assay only, they cannot be considered "imports" within the meaning of the amended complaint's definition of the lines of commerce allegedly monopolized by defendants. While plaintiffs argue that they have not completed discovery, surely the records of Sominac in their possession should establish whether Sominac ever shipped copper materials to the United States during the period from 1969 to 1971. Therefore, to permit further discovery would serve no useful purpose and would unnecessarily prolong this litigation.

■ It is evident to the Court that plaintiffs, in the guise of an antitrust action, are seeking compensation for the loss of the properties of Sominac, which have been taken over and are now operated under the aegis of the Chilean government. For such injury, however, their remedy must lie elsewhere. According to the allegations of the complaint, only importers of Chilean copper to the United States, and not others incidentally injured, have standing here to sue under the antitrust laws for treble damages. See GAF Corp. v. Circle Floor Co., Inc., 463 F.2d 752 (2d Cir. 1972), appeal dismissed, 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973); Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc., 454 F.2d 1292 (2d Cir. 1971), cert. denied, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972); Fields Productions, Inc. v. United Artists Corp., 318 F.Supp. 87 (S.D.N.Y.1969), aff'd per curiam, 432 F.2d 1010 (2d Cir. 1970), cert. denied 401 U.S. 949, 91 S.Ct. 932, 28 L.Ed.2d 232 (1971). Since plaintiffs have made no showing that they were engaged in a line of commerce which defendants restrained or conspired to restrain in violation of the antitrust laws, or that they were injured in their business or property by the acts of defendants, plaintiffs have no standing with respect to the antitrust claims.[6]

For the foregoing reasons, defendants' motion for summary judgment dismissing the antitrust claims in the amended complaint is granted. To the extent defendants' motion seeks an order dismissing the contract claims alleged in the fourth through the eleventh causes of action in the amended complaint, the motion is denied. Accordingly, Codelco's motion for an order extending its time to answer plaintiffs' interrogatories is granted; Codelco shall have 60 days from the date of this order to move or answer with respect to interrogatories relating to the contract claims. Plaintiffs' motion for an order compelling discovery and for costs is denied without

6. Nor can the plaintiffs show that the loss of Sominac's property was proximately caused by acts of the defendants in violation of the antitrust laws of the United States. See Billy Baxter, Inc. v. Coca-Cola Co., 431 F.2d 183 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971); Tepler v. Frick, 204 F.2d 506 (2d Cir. 1953); Lyons v. Westinghouse Electric Corp., 235 F.Supp. 526 (S.D.N.Y.1964).

prejudice to a renewal of the motion if discovery with respect to the contract claims is incomplete after 60 days.[7]

The foregoing constitutes the Court's findings of fact and conclusions of law. Rule 52(a), Fed.R.Civ.P.

Settle order on notice.

---

7. This disposition of the present motions is without prejudice to a renewal of defendant Engelhard's motion to stay this action pending arbitration.